ENPAT, INC., et al., Plaintiffs,

v.

MICROSOFT CORPORATION, et al., Defendants.

No. Civ.A. 97–1909–A.

United States District Court, E.D. Virginia, Alexandria Division.

June 24, 1998.

to correct are entirely within Virginia First and its agents' discretion.

Craig Crandall Reilly, Richards, McGetti-
gan, Reilly & West, PC, Alexandria, VA, for
Enpat, Inc., Seshan Sprinivasan Raj, plain-
tiffs.

William David Dolan, III, Venable, Ba-
etjer, & Howard, McLean, VA, for Microsoft
Corporation, defendant.

Andrew C. Bisulca, Law Office of Andrew
C. Bisulca, PC, Springfield, VA, for Applied
Technology Associates, Inc., defendant.

## MEMORANDUM OPINION

BRINKEMA, District Judge.

Before the Court are defendant Microsoft's
Motion for a *Markman* Hearing and for Par-

tial Summary Judgment Based on Prosecution History Estoppel.

Plaintiff Enpat is the owner of U.S. Patent No. 5,548,506 ("the Patent" or "the '506 Patent") which describes an automated, electronic network based system for managing multiple work groups. Specifically, the patent describes a software program (the "Program") designed to manage one or more complex projects, for example the construction of an office building. Apparently, a human executive tells the Program what the discrete steps are in each project, how long each might be expected to take, what total resources the company has available for all of its projects, etc. The Program then creates schedules for the completion of the various projects, and communicates this information to the employees assigned to each aspect of the project, giving them periodic reminders as to when each target is due. However, the Program is also uniquely interactive: it uses a two-way E-mail system that allows employees to communicate changes in information to the Program, which can then revise the schedule for project completion, and communicate the new targets to employees. Another unique feature of the program is an algorithm which allows the Program to allocate limited resources among several projects (and to reschedule them) based on how a human manager has prioritized them. Finally, the Program collates and organizes information submitted by employees, flags discrepancies, schedules the projects, reminds employees of deadlines, and allocates resources all without benefit of human intervention—no expert planner or executive is needed to make these decisions.

In its *Markman* motion Microsoft asks the Court to find four limitations in the language of Claim 1, which is the only independent claim. Specifically, Microsoft argues that Claim 1 is limited by four terms: (1) Periodic; (2) Automatic; (3) Remote; and (4) Complete. These alleged limitations are discussed in detail below.

▮ To construe a patent claim, a Court must look first to the language of the claim itself. *See Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed.Cir.1996). Second, the Court may look at how a person of ordinary skill in the technical art would construe the language of the patent. Thus, unless a patent gives a special definition for a term, the Court should give it the meaning it normally has in the relevant technical field. *See id.* Third, the Court may look to the patent's specifications and prosecution history. *See id.*

### 1. *Periodic*

▮ Claim 1 lists nine actions that the program performs, *e.g.*, receiving messages from employees, reallocating resources, and issuing reminders and status reports, and indicates that the program "repeat[s] steps (a) through (h) on a *periodic* basis, as desired by said organization work-group team members." Def.Ex. A at col. 9, lines 12–14 (emphasis added). Based on this language, defendant argues that Claim 1 is limited to a program that issues reports and performs the other described functions at fixed, regular intervals, as opposed to intermittently, or on request.

The patent language supports this limitation. For example, a specification for the Reporting function of the program distinguishes between reports which are generated "periodically" and special reports generated "on request." *See* Def.Ex. A at fig. 10 ("Reports Flowchart"). Similarly, the patent's specifications provide that the Reminder function was intended "[t]o track pending tasks and remind task owners on a predetermined frequency on when to start/finish their tasks." Def.Ex. A at fig. 6. Other specification language explains that the Program "is a software process that runs at fixed intervals (example: at the end of the day)," and "responds to the messages and is thus 'event driven,' though the response does not occur immediately but rather batched together for the end of day processing." Def.Ex. B at 11, 15. Finally, the Academic Press Dictionary of Science and Technology defines "periodic" as "occurring at regular intervals."

Accordingly, we construe the Patent to reach only project management programs which perform their functions at fixed intervals, rather than intermittently or on re-

quest. However, the Patent could still encompass programs which allow for both fixed-interval and on-demand reports, because Claim 1 states that the Program performs its functions "on a periodic basis, as desired by said organization work-group team members." Thus, the Patent teaches that team members can reset the periods when the Program issues status reports and other reminders. Although the claim should be limited to a program performing the above functions at fixed intervals, individual team members may modify these fixed intervals for their own purposes in any construction of Claim 1.

### 2. *Automatic*

■ Claim 1 describes a method for managing projects,

> said method to be automatic in nature and with built in triggers which are based on the nature and status of said data without the need for manual project management coordination, said project management coordination to involve all the steps of the project management cycle including planning, resource leveling, status reporting and reminding, tracking and updating plans....

Def.Ex. A at col. 8, lines 49–55. Based on this language, Microsoft argues that Claim 1 is limited to a program which can automatically perform all steps of the project management cycle without the need for human intervention.

Again, the patent specifications and prosecution history support this limitation. The Patent Examiner initially rejected inventor Raj's patent application on the basis of obviousness. To distinguish his invention from prior art, Raj emphasized in a later amendment: "The inventor is not aware of any project management system ... which performed the above 4 [project management] steps automatically, based only on data sent to a server" and that "[n]one of the systems described by Michael Heck are automatic in their behavior with respect to the complete project management cycle." Def.Ex. B at 63–64. Raj further told the Patent and Trademark Office ("PTO") that "[t]he [program] provides a method for hands-off project management. The complaint against project management tools has before this invention [sic] required experts to manage the project management cycle, including coordination, archiving, resource leveling, reminding etc." Def.Ex. B at 64. In particular, Raj noted that his invention improved on commercially available project management software such as defendant's Microsoft Project because, for such programs, "[t]ypically a project coordinator is hired by organizations to manually compile input data, run the tools and distribute progress reports." Def.Ex. B at 7. Thus, we conclude from the inventor's statements that the patented method requires no human inputs in order to perform its specified management roles.

Plaintiffs dispute the notion that Claim 1's use of "automatic" means that the Program was intended to perform all steps of project management without human intervention. Plaintiffs have not offered any evidence drawn from the language of the Patent, its specifications or prosecution history to support their interpretation. Instead, plaintiffs point to Microsoft's use of the word "automatic" in its promotional materials, which we find irrelevant for purposes of this *Markman* hearing.

Plaintiffs are, however, correct in arguing that use of the Patent involves some human intervention. For example, in its description of the invention, the Patent provides that a human project leader "creates a project plan," containing "information on the project, tasks, dependencies and resources to be used." Def.Ex. A at col. 7, lines 32–34; *see also* Def.Ex. A at fig. 3. Similarly, a human manager must assign priorities for multiple projects in order for the Program to perform its algorithm-based function of allocating resources among multiple projects. *See* Def. Ex. A at col. 7, lines 51–54. As discussed above, the periodic basis within which the Program performs specific functions is "as desired by ... work group members." However, none of these features contradicts the clear language in the patent and its specifications and prosecution history that the Program is to perform all four steps of the

project management cycle[1] without human intervention. As the Patent states:

> It should be noted that the operations of the 'Auto Multi–Project Server' are automatic (or self-running) and there is no manual intervention. Only at the staff-up stage is there any manual customization of the environment, by changing some of the program variables and setting up the environment file. In general the operation is driven by mail messages received from users. The 'Auto Multi–Project Server' responds to the messages and is thus 'event driven,' though the response does not occur immediately but rather batched together for the end of day processing, as explained in the next paragraph.

Def.Ex. A at col. 8, lines 7–16.

Accordingly, we find that Claim 1 teaches a method that automatically performs all of the steps in the project management cycle, without the need for manual intervention or supervision, based only on messages sent to the computer. As Microsoft points out, such a claim would not, for example, cover a method in which a human project leader resolved resource conflicts by manually reassigning resources among projects.

3. *Remote*

██ Claim 1 of the Patent describes a method executed by a computer system ... said computer system to comprise of a central database server connected to a[sic] electronic network, said method using a two-way electronic messaging system that allows different types of organizational work-group team members to send messages to the computer program and receive messages from the computer program via the said electronic network.

Def.Ex. A at col. 8, lines 40–48. Based on this language, Microsoft argues that the Program must be construed as "remote," which Microsoft defines as having two elements: (1) the software runs on a central database server; and (2) the software engages in two-way communication with work-group members by E-mail, facsimile, or other electronic messaging system. We find that the clear language of Claim 1 supports both limitations. In his amendment materials to the PTO, Raj explains that the Program is unique in that it responds to input from work-group members with computer-generated messages of its own. As Raj explains:

> [A]ll existing project management system [sic] use email as a "One–Way" data-collection method, i.e. from users to the server. None of the systems offer a 'server to users' email—which implies that server automatically generates messages for the clients (the users) and which gets transferred to the client via the electronic messaging system used (Which may be email, fax or any other form of messaging).

Def.Ex. B at 64. The PTO then granted Raj's application based in part on its unique "two-way messaging system":

> The prior art does not teach or fairly suggest a project management method implementing a "two-way messaging system" wherein the method is "automatic in nature and with built-in triggers which are based on the nature and status of (said) data", the data being sent from a plurality of clients to a server: See claim 1. The claimed invention, namely "Auto Multi–Project Server," is directed to a project management method and is to act as a server-based project coordinator to manage a plurality of projects. The use of the two-way messaging along the built-in triggers of the claimed invention is intended to significantly improve the performance of a project management system by collating/compiling project data, flagging inconsistencies and more specifically by efficiently resolving the inter-project conflicts by re-allocation of critical resources of the plurality of projects.

Def.Ex. B at 110 (Examiner's Statement of Reasons for Allowance).

However, Microsoft has attempted to read other limitations into Claim 1 under the rubric of "remoteness." Specifically, Microsoft argues that the "central server" specified in

---

1. Four specific steps in project management are listed in Claim 1 as: (1) planning; (2) resource leveling; (3) status reporting and reminding; and (4) tracking and updating plans. *See* Def.Ex. A at col. 8, lines 53–55.

Claim 1 must be a computer physically separate from that used by work group members. Microsoft also argues that Claim 1 specifies a system in which users communicate with the Program only indirectly by fax or E-mail, and does not apply to programs in which users may directly input data into the server (for example, via an attached keyboard).

Both limitations should be rejected. Nothing in the claim language, specifications, or prosecution history precludes the "central server" mentioned in Claim 1 from residing on the personal computer of a work-group member, for example the human project manager. Likewise, the fact that Claim 1 specifies a "two-way messaging system" for communications with the Program does not mean that methods which also allow for direct input via keyboard into the computer server should be deemed non-infringing. Indeed, the term "messaging system" is not comprehensively defined and may include direct keyboard input. Moreover, it is obvious from other sections of the patent that occasional direct input is possible, and contemplated. If not, how else could individual team members modify the fixed periods for reports?

### 4. Complete

■ As mentioned above, Claim 1 states that the Program will automatically complete "all the steps of the project management cycle including planning, resource leveling, status reporting and reminding, [and] tracking and updating plans." Def.Ex. A at col. 8, lines 53–55. Claim 1 identifies nine specific actions the Program automatically and periodically carries out in order to perform these four steps. See Def.Ex. A at col. 8, lines 59–67 to col. 9, lines 1–11.

As stated above, Claim 1 should be read to require that the Program automatically perform all four of the enumerated project management steps. Microsoft argues that the Court should find a limitation that the Program must automatically perform at least two of the nine method actions mentioned above: saving plans and reallocating resources. We agree with this interpretation because the language of Claim 1 makes it clear that the Program automatically saves

plans and reallocates resources as a means to accomplish the different stages of the project management cycle.

Microsoft asks for another limitation: that the Program automatically generate "critical path information." This does not appear to be an explicit limitation of the invention. Raj only indicated to the PTO that the Program generates "reports . . . for critical path information." Def.Ex. B at 17. Therefore, we will not read this limitation into the patent. Lastly, Microsoft points to claim language that the Program "reallocat[es] resources if necessary based on inter-project priorities" from which it argues that Claim 1 should not apply to programs which allocate resources among individual tasks within a given project. We find nothing within the Patent's language to support such a limitation.

Given these rulings on the claims of the patent, the Court defers addressing Microsoft's Motion for Partial Summary Judgment (Prosecution History Estoppel) because there is inadequate evidence before it upon which to determine whether the accused Microsoft products infringe under the doctrine of equivalents.